IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND GREPPI,<br>　　Plaintiff,<br>　　v.<br>ANDREW SAUL, Commissioner of Social Security,<br>　　Defendant. | Case No. 20-cv-03189-MMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Doc. Nos. 17, 26 |

Before the Court is plaintiff Raymond Greppi's ("Greppi") motion for summary judgment, filed December 15, 2020, by which Greppi seeks review of a decision issued May 2, 2019, by an administrative law judge ("ALJ"), denying his claim for Social Security supplemental security income ("SSI"). Also before the Court is the cross-motion for summary judgment, filed February 17, 2021, by defendant, the Commissioner of Social Security ("Commissioner"). Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having read and considered the parties' respective written submissions, the Court rules as follows.

**BACKGROUND**

On December 12, 2017, Greppi filed an application for SSI, alleging a period of disability beginning September 5, 2017, based on several mental impairments, specifically, bipolar disorder, anxiety, and post-traumatic stress disorder. On January 24, 2018, the Social Security Administration ("SSA") denied Greppi's application and, on May 8, 2018, denied his request for reconsideration. Subsequently, Greppi requested a hearing before an ALJ. On March 7, 2019, the ALJ conducted a hearing, at which Greppi and his mother, as well as a vocational expert ("VE"), testified.

At the hearing, Greppi described his symptoms, including being "down or unable to get out of bed" for a "couple [of] weeks" when "depressed," "angry" if interrupted when in a "period of focus," "forgetful," "los[ing] . . . [his] train of thought a lot" (see Administrative Record ("AR") 42), and "dizzy" as "a side effect from the pills [he] take[s]" (see id. 47). Greppi further testified he "can't be around people [he] do[es]n't know" (see id. 51), and his mother, Mary Greppi, testified "he gets scared and paranoid in a situation when there's people there that he doesn't know" (see id. 56).

Following the above testimony, the ALJ posed a series of employment hypothetical questions to the VE, inquiring about Greppi's ability to perform his past relevant work,[1] with specified restrictions. In response, the VE testified Greppi could perform all past relevant work, if "limited to frequent interaction with supervisors, co-workers, and the public" (see id. 65), and, if further limited to "perform[ing] simple routine tasks," to "interact[ing] with co-workers only on a superficial, non-collaborative basis," to "work[ing] in a non-public setting," and to "mak[ing] simple work-related decisions," he could perform the job of "warehouse worker" (see id. 65-66). Lastly, in response to follow-up questions from the ALJ and Greppi's attorney as to the impact of various additional hypothetical limitations, the VE testified he "would not be able to maintain employment." (See id. 66-67.)

On May 2, 2019, the ALJ issued his decision, finding, based on the five-step sequential evaluation process set forth in the Code of Federal Regulations,[2] Greppi was

---

[1] The VE identified as Greppi's past relevant work his prior jobs as an "electrician," "cable television installer," "[w]arehouse worker," "[w]aste disposal manager," and "building maintenance repairer." (See id. 63-64.)

[2] "The five-step process for disability determinations begins, at the first and second steps, by asking whether a claimant is engaged in 'substantial gainful activity' and considering the severity of the claimant's impairments. If the inquiry continues beyond the second step, the third step asks whether the claimant's impairment or combination of impairments meets or equals a listing under 20 C.F.R. pt. 404, subpt. P, app. 1 and meets the duration requirement. If so, the claimant is considered disabled and benefits are awarded, ending the inquiry. If the process continues beyond the third step, the fourth and fifth steps consider the claimant's 'residual functional capacity' in determining whether the claimant can still do past relevant work or make an adjustment to other work." See Garrison v. Colvin, 759 F.3d 995, 1007 n.6 (9th Cir. 2014) (quoting Kennedy

2

1  not disabled.  At step one, the ALJ determined Greppi had not engaged in substantial

2  gainful activity since the application date.  (See id. 13.)  At step two, the ALJ found

3  Greppi had four "severe impairments," namely, "depressive versus bipolar disorder,"

4  "anxiety disorder," "personality disorder," and "post-traumatic stress disorder."  (See id.)

5  At step three, the ALJ determined Greppi did not have an impairment or combination of

6  impairments that met or equaled a listed impairment; in so determining, the ALJ found

7  Greppi had "moderate limitation" in "understanding, remembering, or applying

8  information," "interacting with others," "concentrating, persisting, or maintaining pace,"

9  and "adapting or managing oneself."  (See id. 13-14).

10   Before continuing to step four, the ALJ determined Greppi's "residual functional

11  capacity" ("RFC")[3] and, in that regard, found Greppi could perform "a full range of work at

12  all exertional levels" but with nonexertional limitations; specifically, the ALJ found Greppi

13  was able to "perform simple routine tasks," to "make simple work-related decisions," to

14  "interact with supervisors frequently," to "interact with coworkers only on a superficial,

15  noncollaborative basis," and was "never able to interact with the public."  (See id. 15.)

16   In determining Greppi's degree of functional limitation and RFC, the ALJ primarily

17  relied on the treatment records, titled "progress notes" (see, e.g., id. 330), submitted by

18  Charles Montgomery, M.D. ("Dr. Montgomery"), a psychiatrist who treated Greppi over a

19  period of years.  In his notes, covering a course of a treatment from February 24, 2017, to

20  January 4, 2019, Dr. Montgomery documented Greppi's self-reported symptoms of

21  "sadness," "anxiety," and problems with "focus and concentration."  As to the first and

22  third, Dr. Montgomery characterized the reported severity as "moderate"[4] and, as to the

---

v. Colvin, 738 F.3d 1172, 1175 (9th Cir. 2013)) (internal citations omitted).

[3] RFC is "the most [the claimant] can still do despite [his] limitations." See 20 C.F.R. § 416.945(a)(1); see also SSR 96-8p, 1996 WL 374184, at *1 (explaining "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," i.e., "8 hours a day, for 5 days a week, or an equivalent work schedule").

[4] The Court assumes Dr. Montgomery, in the progress notes, used "moderate" in the same manner as in the Questionnaires he submitted wherein the term is defined as follows: "[A]bility to function is fair (performance would be expected to be precluded by

3

second, "moderate to severe" in 2017, and "moderate" in 2018.  (See id. 330-32, 336-40, 342, 386-90, 392-94, 396.)  In addition to his notations as to his patient's complaints, Dr. Montgomery included his observations of Greppi's behavior during their appointments; in particular, Dr. Montgomery observed Greppi's "[m]ood" to be "[d]epressed/[a]nxious" between February and October 2017 (see id. 336-39, 341-42), "[d]ysthymic" between November 2017, and March 2018 (see id. 343-45), "[d]epressed" in March 2018 (see id. 346), "[e]uthymic" between May and August 2018 (see id. 387-89, 391), and "[a]nxious" between September 2018, and January 2019 (see id. 392-93, 395-96).

Additionally, the ALJ relied on the opinions of three psychologists, namely, consultative examiner Jeremy Blank, Psy.D. ("Dr. Blank"), as well as non-examining consultants Patrice Solomon, Ph.D. ("Dr. Solomon") and David Atkins, Ph.D. ("Dr. Atkins").  The ALJ found those opinions "partially persuasive."  (See id. 17-18.)

Dr. Blank, in a "summary report of the Complete Psychological Evaluation" dated February 23, 2017, found Greppi was "[m]ild[5] to mod[erately][6] impaired" in his ability to "withstand the stress of a routine workday," to "adapt to changes in job routine" and "changes, hazards or stressors in workplace setting," as well as "[m]ildly impaired" in his ability to "maintain adequate attention/concentration" and "interact appropriately with co-workers, supervisors, and the public on a regular basis."  (See id. 380.)[7]

Thereafter, on January 21, 2018, Dr. Solomon found Greppi could "sustain simple tasks over [the] work week" and have "LPC [limited public contact]."  (See id. 97.)  On April 30, 2018, Dr. Atkins found Greppi was able to "understand, remember, and . . . carry out a two-step command involving simple instructions," to "sustain C/P/P [concentration,

---

20% in an 8-hour day)."  (See id. 356.)

[5] The form attached to Dr. Blank's report provides the following definition of "mild": "There is a slight limitation in this area, but the individual can generally function well." (See id. 381.)

[6] The form attached to Dr. Blank's report provides the following definition of "moderate": "There is more than a slight limitation in this area[,] but the individual is still able to function satisfactorily."  (See id. 381.)

[7] The ALJ did not elaborate as to which parts of the above he found persuasive.

4

persistence, or pace] w[ith] work tasks for 2 h[ou]r blocks of time w[ith] customary breaks," to "adapt to routine and predictable work environment on a daily basis," and to "accept routine supervision and interact w[ith] coworkers." (See id. 114.)[8]

Although, as noted, the ALJ relied on Dr. Montgomery's progress notes, he considered, but did not accept, the opinions Dr. Montgomery provided in two questionnaires he submitted to the SSA, nor did the ALJ accept the opinions provided in reports submitted by two consultative examiners, namely, Katherine Wiebe, Ph.D. ("Dr. Wiebe") and Deepa Abraham, Ph.D. ("Dr. Abraham").[9]

In particular, Dr. Montgomery, in a "Mental Impairment Questionnaire" dated March 30, 2018, found Greppi had "marked"[10] impairment of his "overall" ability to "understand, remember, and apply information," to "interact with others," to "concentrate, persist, or maintain pace," and to "adapt or manage oneself." (See id. 356-57.) A year later, in a "Mental Impairment Questionnaire" dated March 1, 2019, Dr. Montgomery found Greppi continued to have "marked" impairment of his "overall" ability to "understand, remember, and apply information" and "interact with others." (See id. 400.)

Thereafter, Dr. Wiebe, in a "Confidential Psychological Report" dated March 8, 2019, found Greppi had "marked"[11] impairment of his ability to "[i]nteract appropriately with the general public," to "[g]et along and work with others without excessive irritability, sensitivity, argumentativeness, or suspiciousness," to "[a]ccept instructions and respond appropriately to criticism from supervisors," to "[r]espond appropriately to changes in a routine work setting and deal with normal work stressors," and to "[m]aintain regular

---

[8] As with Dr. Blank's opinions, the ALJ did not elaborate as to which parts of Dr. Solomon's and Dr. Atkins' opinions he found persuasive.

[9] Greppi does not challenge the ALJ's rejection of Dr. Abraham's opinions and, consequently, the Court does not further address them herein.

[10] The Questionnaire provides the following definition of "marked": "[A]bility to function seriously limited (performance would be expected to be precluded by more than 20%)." (See id. 356.)

[11] The form attached to Dr. Wiebe's report provides the following definition of "marked": "[T]he patient is unable to perform the activity on a sustained basis in a 5 day a week, 8 hour a day, normal work setting." (See id. 420.)

5

attendance and be punctual within customary usually strict tolerances." (See id. 421.) Dr. Wiebe further found Greppi had "moderate[12] [to] marked" impairment of his ability to "[u]nderstand, remember and carry out detailed instructions," to "[m]aintain attention and concentration for two-hour segments," and to "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms." (See id.) Lastly, Dr. Wiebe found Greppi had "moderate" impairment of his ability to "[p]erform at a consistent pace without an unreasonable number and length of rest periods," along with "mild[13] [to] moderate" impairment of his ability to "[u]nderstand, remember and carry out very short and simple instructions." (See id.)

After rejecting all of the above-referenced opinions, the ALJ, proceeding to step four and relying on the VE's testimony, found Greppi was "capable of performing his past relevant work as a [w]arehouse [w]orker," and, based thereon, denied Greppi's application. (See id. 19.)

Greppi thereafter requested the Appeals Council ("AC") review the ALJ's decision. On March 12, 2020, the AC denied review, explaining it had considered the reasons why Greppi disagreed with such decision and that said reasons "d[id] not provide a basis for changing" the decision. (See id. 1.)

On May 9, 2020, Greppi filed the instant petition for review.

**STANDARD OF REVIEW**

"An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." See Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

---

[12] The form attached to Dr. Wiebe's report provides the following definition of "moderate": "[T]he patient has a significant loss of ability to perform the activity on a sustained basis in a 5 day a week, 8 hour a day, normal work setting." (See id. 420.)

[13] The form attached to Dr. Wiebe's report provides the following definition of "mild": "[I]n spite of some impairment, the patient retains the ability to perform this activity in a normal work setting." (See id. 420.)

6

adequate to support a conclusion." See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and . . . resolving ambiguities." See id.

The court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely." See Garrison, 759 F.3d at 1010. The court must consider "the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion," see Andrews, 53 F.3d at 1039, and "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," see id. at 1039–40.

"Even when the ALJ commits legal error," the court must "uphold the decision where that error is harmless." See Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation, citation, and alteration omitted). "An error is harmless only if it is inconsequential to the ultimate nondisability determination." See id. at 494 (internal quotation and citation omitted).

**DISCUSSION**

In his motion for summary judgment, Greppi argues the ALJ erred in assessing both the medical evidence, as well as his and his mother's testimony, and, consequently, contends the ALJ's step-three finding that he did not have an impairment meeting or equaling any of the listed impairments and his step-four finding that he could perform his past relevant work were not supported by substantial evidence. The Court discusses below, in turn, the medical evidence and testimony.

**1. Medical Evidence**

Greppi argues the ALJ erred in rejecting the opinions offered by Dr. Montgomery and Dr. Wiebe. In considering Greppi's arguments, the Court first addresses the parties' dispute as to the regulation governing the Court's analysis.

**a. Applicable Regulation**

For claims filed before March 27, 2017, the SSA "will give . . . controlling weight" to the medical opinion of a "treating source," provided such opinion is "well-supported by

7

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," see 20 C.F.R. § 416.927(c)(2); where the SSA does not "give a treating source's medical opinion controlling weight," it will "[g]enerally . . . give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]," see id. § 416.927(c)(1). For claims filed on or after March 27, 2017, however, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." See id. § 416.920c(a).

Although the instant application seeks SSI, under Title XVI of the Social Security Act, and was filed by Greppi on December 12, 2017, he argues "the instant claim should be consolidated with [his] prior unresolved . . . claim" for Social Security disability income ("SSDI") filed, under Title II of the Social Security Act, on July 30, 2015, and thus, according to Greppi, both claims should be evaluated under the regulation applicable to claims filed before March 27, 2017. (See Reply at 2:13-14.)[14] In support thereof, Greppi relies on the "Hearings, Appeals, and Litigation Manual" ("HALLEX") which provides, where a subsequent application filed on or after March 27, 2017 "involves an overlapping period on the same title" as a pending application filed before March 27, 2017, the two cases will be consolidated and "adjudicators will apply the prior rules to the consolidated case." See SSA, HALLEX 1-5-3-30, REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE (2018).

As the Commissioner points out, however, Greppi's subsequent application does not involve an "overlapping period on the same title." See id. Indeed, in a cover letter accompanying the instant application, Greppi's counsel acknowledged "there is no overlapping period of time or 'common issue'" (see Jenkins Decl. Ex. A), and there can be no question that the two applications were made under two separate titles,

---

[14] Greppi's prior claim was initially denied by the SSA and, following the Ninth Circuit's reversal of that denial, was pending at least as of the close of briefing on the instant motions.

8

1    specifically, Title II and Title XVI.

2    In light of the above, the Court finds Greppi's claim was, at the time of the ALJ's decision, subject to the regulation applicable to claims filed on or after March 27, 2017, namely, 20 C.F.R. § 416.920c, the regulation on which the ALJ relied.

Pursuant thereto, the SSA considers medical opinions according to the following factors: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) "[o]ther factors," which "include[ ], but [are] not limited to," the medical source's "familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." See 20 C.F.R. § 416.920c(c)(1)-(5). Of the above factors, "supportability"[15] and "consistency"[16] are "the most important," and, consequently, the SSA "will explain how [it] considered [those two] factors." See id. § 416.920c(b)(2).[17]

The Court next turns to Greppi's challenges to the ALJ's decision.

### b. Dr. Montgomery's Opinions

Greppi contends the ALJ erred in accepting the opinions offered by non-examining consultants Dr. Solomon and Dr. Atkins instead of the opinions offered by Dr. Montgomery, his treating psychiatrist. Contrary to Dr. Solomon and Dr. Atkins, Dr. Montgomery, as noted, found Greppi had "marked" impairment of his "overall" ability to "understand, remember, and apply information," to "interact with others," to "concentrate, persist, or maintain pace," and to "adapt or manage oneself." (See AR 356-57, 400.)

---

[15] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." See 20 C.F.R. § 416.920c(c)(1).

[16] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." See 20 C.F.R. § 416.920c(c)(2).

[17] The SSA is not required to explain how it considered the other three factors unless "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same." See id. § 416.920c(b)(2)-(3).

9

Although, under the regulation applicable to claims filed on or after March 27, 2017, a treating source's medical opinion is no longer given controlling weight, an ALJ nonetheless must still "explain how [h]e considered the supportability and consistency factors," see 20 C.F.R. § 416.920c(b)(2), and, assumedly, any such explanation must be reasonable.

Here, the ALJ found Dr. Montgomery's opinions "unpersuasive" because, according to the ALJ, they were "inconsistent with his underlying treatment records, which describe[d] mostly moderate symptoms," and were "not well explained." (See AR 17.) Further, the ALJ found the initial Questionnaire was "not an independent assessment," as Dr. Montgomery "filled out the forms together with [the claimant]," and that the updated Questionnaire was incomplete, as "there appear[ed] to be crucial pages missing." (See id. 18.)

The Court, as set forth below, finds the above-referenced reasons do not provide a sufficient basis for rejecting Dr. Montgomery's opinions.

First, any "inconsistencies" as to the opinions Dr. Montgomery offered in connection with the instant claim were, like those considered by the Ninth Circuit in reversing the denial of Greppi's earlier claim, solely with "Greppi's self-described symptoms[;] there was no inconsistency between Dr. Montgomery's own observations and his opinion[s]." See Greppi v. Saul, 811 F. App'x 442, 442-43 (9th Cir. 2020). Moreover, although Dr. Montgomery characterized Greppi's self-reported symptoms as "moderate," he also characterized those reported symptoms as "worse" under specified conditions, including "with work stress." (See AR 330-32, 336-40, 342, 386-90, 392-94, 396.)

Second, although the ALJ found Dr. Montgomery's opinions were not well-explained, his explanations were superior to those provided by the two non-examining consultants, namely, Dr. Solomon and Dr. Atkins, whose opinions the ALJ, as noted, found "partially persuasive." (See id. 17.) Notably, in the initial Questionnaire, Dr. Montgomery, in a section asking him to "[d]escribe the clinical findings that support your

10

opinion of your patient's functioning," pointed to Greppi's "mood lability from depressed to manic (eleva[t]ed mood swings[)]" and "extreme anxiety in social situations" (see id. 357); similarly, in the same section of the updated Questionnaire, Dr. Montgomery pointed to Greppi's "mood lability – depressed [&] hypomanic episodes" and being "easily overwhelmed with anxiety in social situations" (see id. 401). By contrast, Dr. Solomon and Dr. Atkins, without citing to any specific findings in Dr. Montgomery's progress notes, concluded, respectively, that Greppi's mental status examinations were "much improved" (see id. 93), and that Dr. Montgomery's opinions were "too restrictive" (see id. 110-11).

Third, Dr. Montgomery's acknowledgement that he "filled out [the initial Questionnaire] with [the] patient" (see id. 386), is not a sufficient ground for rejecting the opinions offered by Dr. Montgomery therein, at least without the ALJ's explaining how he believed Greppi's presence actually affected those opinions. Moreover, a psychiatric diagnosis, as the Ninth Circuit has noted, "will always depend in part on the patient's self-report" and, consequently, "partial reliance on [a claimant's] self-reported symptoms is . . . not a reason to reject his opinion." See Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (holding "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness").

Lastly, to the extent any pages were missing from the updated Questionnaire, the ALJ's reliance on any such oversight is unavailing, as "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (internal quotation and citation omitted).

The Court thus finds the ALJ erred in rejecting Dr. Montgomery's opinions.

### c. Dr. Wiebe's Opinions

Next, Greppi contends the ALJ erred in rejecting the opinions offered by Dr. Wiebe, who unlike Dr. Solomon and Dr. Atkins, examined Greppi, administered a number

of tests, and submitted a detailed report as to her findings.[18] Dr. Wiebe's opinions can be summarized[19] as finding a "marked" impairment of Greppi's ability to interact with others, a "moderate [to] marked" impairment of his ability to adapt or manage oneself, a "moderate [to] marked" impairment of his ability to concentrate, persist, or maintain pace, and, depending on the complexity of the instructions, a "mild [to] moderate" and "moderate [to] marked" impairment of his ability to understand, remember, or apply information. (See AR 421.)[20]

The ALJ found Dr. Wiebe's opinions "unpersuasive" because, according to the ALJ, they were "inconsistent with [Greppi's] treatment records, which indicate[d] generally moderate symptoms." (See id. 18.) Further, as the ALJ found, the mental status examination completed by Dr. Wiebe was "inconsistent with the mental status examinations in the treatment records" and with "the mostly normal mental status examination" performed by Dr. Blank. Lastly, the ALJ found the "test results" reported by Dr. Wiebe were "inconsistent with [Greppi's] test results at a prior psychological evaluation" performed by Dr. Abraham. (See id.)

The Court, as set forth below, finds the above-referenced reasons do not provide a sufficient basis for rejecting Dr. Wiebe's opinions.

---

[18] Additionally, by challenging the ALJ's rejection of Dr. Wiebe's opinions, Greppi appears to implicitly challenge the ALJ's partial reliance on the opinions of Dr. Blank who, like Dr. Wiebe, performed testing. Dr. Blank, however, performed considerably fewer tests than Dr. Wiebe (compare AR 378 with id. 406-407); moreover, the record only contains his "summary report" (see id. 376), as compared with Dr. Wiebe's considerably longer and more detailed report.

[19] At step three, the SSA considers four "areas of mental functioning a person uses in a work setting," specifically, the abilities to (1) "[u]nderstand, remember, or apply information," (2) "interact with others," (3) "concentrate, persist, or maintain pace," and (4) "adapt or manage oneself." See 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00. Dr. Wiebe did not make a single finding as to each of the above-listed four areas; rather, she made findings as to specific examples falling within each of those areas.

[20] For a finding of disability at step three, "[the claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." See 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00. Although Greppi asserts that both Dr. Montgomery and Dr. Wiebe found "multiple marked impairments . . . in the B criteria" (see Pl.'s Mot. at 5:14-15), Dr. Wiebe, as set forth above, did not so find.

First, to the extent inconsistencies arguably existed between Dr. Wiebe's opinions and the treatment records, those inconsistencies, like any such inconsistencies discussed earlier herein, were solely with Greppi's self-described symptoms and not with Dr. Montgomery's observations of his patient. There were no inconsistencies between Dr. Wiebe's opinions and Dr. Montgomery's observations.

Second, although the ALJ stated there were inconsistencies between the mental status examination completed by Dr. Wiebe and the mental status examinations performed by Dr. Montgomery and Dr. Blank, the ALJ failed to identify any such inconsistency and indeed the record is to the contrary. In particular, Dr. Wiebe found, for example, Greppi's "mood was depressed, dysphoric, and anhedonic" (see id. 406), a finding consistent with Dr. Montgomery's description of Greppi's mood as being, with the exception of one four-month period in 2018, "[d]ysthymic" (see id. 343-45), "[d]epressed" (see id. 346), "[a]nxious" (see id. 392-93, 395-96), or both (see id. 336-39, 341-42), and with Dr. Blank's description of Greppi's mood as "depressed" (see id. 378).

Lastly, although, as the ALJ stated, there were inconsistencies between the test results reported by Dr. Wiebe and the test results reported by Dr. Abraham, the ALJ, again, failed to identify any such inconsistency. Moreover, and perhaps more importantly, the ALJ rejected Dr. Abraham's opinions.

The Court thus finds the ALJ erred in rejecting Dr. Wiebe's opinions.

**2.     Testimony**

Where, as here, the claimant "has presented evidence of an underlying impairment and the government does not argue that there is evidence of malingering, [the court] review[s] the ALJ's rejection of [the claimant's] testimony for specific, clear and convincing reasons." See Burrell v. Colvin, 775 F.3d 1133, 1136–37 (9th Cir. 2014) (internal quotation and citation omitted).

At the hearing, as noted, Greppi testified he was "down or unable to get out of bed" for a "couple [of] weeks" when "depressed," "angry" if interrupted when in a "period of focus," "forgetful," "los[ing] . . . [his] train of thought a lot" (see AR 42), and "dizzy" as "a

side effect from the pills [he] take[s]" (see id. 47). Of particular importance, Greppi testified he "can't be around people [he] do[es]n't know." (See id. 51.)

The ALJ rejected Greppi's testimony because, according to the ALJ, his "symptoms ha[d] generally improved and been described as moderate" and his "mental status examinations ha[d] improved." (See id. 17.)

In so finding, the ALJ relied on the progress notes provided by Dr. Montgomery, in particular, Dr. Montgomery's characterization of Greppi's self-reported symptoms as "moderate," as well as his observation of Greppi's "mood" as having improved from "depressed/anxious" to "euthymic" and his "attention and concentration" having improved from "impaired" to "within normal limits." (See id.) The ALJ's reasons, as discussed below, however, do not meet the requisite standard.

In particular, although Dr. Montgomery used the word "moderate" to describe, as a general matter, Greppi's self-reported symptoms of depression, anxiety, and concentration/focus, he also characterized those symptoms as "worse" with "work stress" (see id. 330-32, 336-40, 342, 386-90, 392-94, 396), and noted Greppi's "difficulty making appointment[s] due to his anxiety [about] leaving home" (see id. 346, 386; see also id. 334, 344, 392). Further, the only times Dr. Montgomery described Greppi's mood as "[e]uthymic" was during a four-month period in 2018. (See id. 387-89, 391.) At all other times, both before and after that period, he described Greppi's mood as "[d]ysthymic" (see id. 343-45), "[d]epressed" (see id. 346), "[a]nxious" (see id. 392-93, 395-96), or both (see id. 336-39, 341-42), and, as the Ninth Circuit has explained, "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working," see Garrison, 759 F.3d at 1017. Similarly, although Dr. Montgomery observed Greppi's "attention and concentration" to be "within normal limits" during office visits, he concurrently reported Greppi's accounts of "difficulty with focus and concentration" when elsewhere. (See

1  AR 386-90, 392-94, 396.)[21]

2  Next, as to Greppi's mother's testimony, there can be no dispute that "[l]ay
testimony as to a claimant's symptoms is competent evidence that an ALJ must take into
account, unless he or she expressly determines to disregard such testimony and gives
reasons germane to each witness for doing so." See Diedrich v. Berryhill, 874 F.3d 634,
640 (9th Cir. 2017) (quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)). Here,
Mary Greppi testified Greppi "gets scared and paranoid in a situation when there's people
there that he doesn't know" and "won't go to things where there's a lot of people, even if
he's known them all his life." (See AR 56.) Although the ALJ stated he had "considered
. . . the testimony of [Greppi's] mother" (see id. 19), he appears to have rejected her
testimony without explanation for doing so.

The Court thus finds the ALJ erred in rejecting the testimony given by Greppi and
his mother.

### 3. Harmless Error

As set forth above, even where an ALJ has erred, his decision must be upheld if
the error was harmless. Here, the ALJ's determination as to Greppi's ability to perform
his past relevant work as a warehouse worker was predicated on the VE's response to a
hypothetical question in which the VE was asked to assume Greppi was capable of
"frequent interaction with supervisors" (see id. 65), an assumption contrary to the
progress notes the ALJ accepted, as well as the opinions offered by both Dr.
Montgomery and Dr. Wiebe, and the testimony given by Greppi and his mother, all of
which the ALJ rejected without adequate explanation. Such error cannot be deemed
harmless.

//

---

[21] To the extent the ALJ, in an earlier section of his decision, cited Greppi's "liv[ing] with his girlfriend" and "go[ing] to family dinner once a week" (see id. 14), the Court notes such activities likewise are not inconsistent with Greppi's testimony, wherein, as quoted above, he stated he "can't be around people [he] do[es]n't know" (see id. 51).

15

### 4. Remedy

Greppi requests the Court remand his claim for an award of benefits or, in the alternative, for further proceedings.

"A remand for an immediate award of benefits is appropriate . . . only in rare circumstances," see Brown-Hunter, 806 F.3d at 495 (internal quotation and citation omitted), namely, where the following three requirements are met: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," see Garrison, 759 F.3d at 1020. Even if such requirements are met, however, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the reviewing court's] discretion." See Treichler v. Comm'r of Soc. Sec., 775 F.3d 1090, 1101–02 (9th Cir. 2014) (internal quotation and citation omitted).

Here, the Court finds the record has not been fully developed and that further administrative proceedings would serve a useful purpose. See Garrison, 759 F.3d at 1020. At a minimum, it is not clear that, if the VE had been given a hypothetical question that included additional limitations, no other work would be available.

Accordingly, the Court finds it appropriate to remand for further proceedings.

## CONCLUSION

For the reasons set forth above, Greppi's motion for summary judgment is hereby GRANTED, the Commissioner's cross-motion for summary judgment is hereby DENIED, and the action is hereby REMANDED, under section four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: June 2, 2021

MAXINE M. CHESNEY
United States District Judge

16